# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

JUSTIN LAMAR WINCH, an attorney at law,
in his individual capacity and on behalf of
similarly situated borrowers,
    ***Plaintiff,***

**VERSUS**

        **CIVIL ACTION**

        **NO. _____**
        **SECTION: _____**

FREEDOM MORTGAGE CORPORATION;
HALLIDAY, WATKINS & MANN, P.C.;
STANLEY C. MIDDLEMAN, individually;
JOHN DOES 1–25,
    ***Defendants.***

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND CLASS CERTIFICATION

Plaintiff Justin Lamar Winch ("Plaintiff") files this Complaint against Defendants Freedom Mortgage Corporation ("Freedom"), Halliday, Watkins & Mann, P.C. ("HWM"), Stanley C. Middleman ("Middleman"), and John Does 1–25 (collectively, "Defendants"), and alleges as follows:

## I.    NATURE OF THE ACTION

1.

Plaintiff brings this action to vindicate his own federal and state rights as a borrower and homeowner, and on behalf of thousands of similarly situated Americans who—though entitled to the protection of this Nation's consumer-protection laws—are routinely deprived of meaningful access to the courts when mortgage servicers engage in abusive, deceptive, and unlawful practices.

2.

This case arises from systemic misconduct in the servicing and collection of a federally-backed, FHA-insured, Ginnie Mae–pooled mortgage loan, including: misrepresentations of the amount due; unlawful "dual tracking"; refusal to accept contractual cure payments; automated payment lockout mechanisms; wrongful default classification; the imposition of unauthorized inspection fees; and the initiation of collection activity without lawful acceleration, without required notices, and in violation of federal servicing standards.

3.

The conduct at issue is not an isolated clerical error. It is part of a pattern and practice of unlawful servicing behavior embedded in Freedom's automated systems and enterprise-level policies— systems designed, approved, and overseen by Defendant Stanley C. Middleman, who has been on regulatory notice of similar servicing violations for years.

4.

Plaintiff seeks declaratory and injunctive relief, actual damages (including emotional distress), statutory damages, punitive or exemplary damages where authorized, attorneys' fees and costs, and such further relief as justice requires, both individually and on a class-wide basis.

## II. JURISDICTION AND VENUE

5.

This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under, inter alia:

a. the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.;

b. the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 et seq., and Regulation X, 12 C.F.R. Part 1024;

c. the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and Regulation Z, 12 C.F.R. Part 1026.

6.

This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. R.S. 51:1401 et seq., because those claims arise from the same nucleus of operative facts.

7.

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the property securing the loan—404 Stafford Place, New Orleans, Louisiana 70124—is located in this District, and a substantial part of the events or omissions giving rise to the claims occurred here.

## III. PARTIES

8.

Plaintiff

Plaintiff Justin Lamar Winch is a natural person, a licensed attorney, and the owner-occupant of the residential property located at 404 Stafford Place, New Orleans, Louisiana 70124.

9.

Defendants

Defendant Freedom Mortgage Corporation is a national mortgage servicer that conducts business in Louisiana and services Plaintiff's FHA-insured mortgage loan, which is pooled into a Ginnie Mae mortgage-backed securities program

Defendant Halliday, Watkins & Mann, P.C. is a law firm that conducts foreclosure and debt-collection activities for Freedom across multiple states, including Louisiana.

11.

Defendant Stanley C. Middleman is the President, Chief Executive Officer, and controlling owner of Freedom. He personally executed multiple regulatory consent orders addressing Freedom's unlawful servicing practices and has direct supervisory authority over Freedom's policies, systems, and compliance.

12.

John Does 1–25 are Freedom employees, technology vendors, inspection contractors, collection agents, and other persons whose identities are presently unknown, who participated in or were responsible for the servicing and collection conduct alleged in this Complaint.

## IV. SYSTEMIC PATTERN OF SERVICING MISCONDUCT AND PRIOR NOTICE TO FREEDOM

13.

Plaintiff brings this action not only on his own behalf but also on behalf of similarly situated borrowers nationwide who have been subjected to Freedom's recurring, systemic servicing misconduct—misconduct documented in public complaints, federal litigation, and regulatory enforcement actions.

14.

Freedom has long been on actual notice that its mortgage-servicing practices violate federal law, including RESPA, Regulation X, the FDCPA, and servicing standards governing FHA-insured and Ginnie Mae–pooled loans. Despite such notice, Freedom continues to employ the same practices: misapplication of payments; imposition of unauthorized fees; creation of artificial delinquencies; manipulation of escrow; and advancing loans toward foreclosure without lawful acceleration or meaningful review.

15.

For example, in Bagala v. Freedom Mortgage Corp., No. 3:24-ap-01006 (MDLA 2024), a pro se borrower alleged that Freedom: accepted payments and then treated them as insufficient; applied unexplained fees and inspection charges; suddenly reclassified his loan as in default; and initiated foreclosure while he believed he was compliant—ultimately resulting in the loss of his home.

16.

Although borrowers like Mr. Bagala may lack the technical vocabulary to describe specific statutory violations, the symptoms they report mirror the core architecture of Freedom's misconduct: systems that force grouped payments, prevent application to the earliest delinquent installment, automatically layer on fees, manipulate escrow analyses, and obscure a borrower's true status until foreclosure is imminent.

17.

Borrowers across jurisdictions repeatedly describe being: locked out of payment portals at critical times; forced to accept "all-or-none" payment bundles; assessed property inspection fees without lawful basis; given conflicting or misleading communications from servicer and foreclosure

counsel; and advanced toward foreclosure on FHA or Ginnie Mae–pooled loans without the protections mandated by HUD and federal servicing rules.

18.

These failures are not mere contract breaches. They constitute unsafe and unsound servicing practices incompatible with federal housing policy and Ginnie Mae's MBS Guide, which require accurate loan-level data, proper application of payments, faithful adherence to loss-mitigation hierarchies, and foreclosure only as a last resort.

19.

Freedom and Middleman have been repeatedly sanctioned by regulators, including state financial regulators issuing consent orders that identify unauthorized fees, inaccurate disclosures, improper recordkeeping, unlicensed activity, and deceptive conduct toward borrowers. Middleman has personally signed such orders.

20.

Despite these enforcement actions, Freedom has continued to operate servicing systems that predictably: accelerate delinquency; generate fee revenue; restrict borrower ability to cure; prematurely advance loans toward foreclosure; and shift financial risk onto borrowers and federal insurance programs.

21.

This pattern-and-practice evidence is directly relevant to Defendants' knowledge, intent, and recklessness; the foreseeability of harm to Plaintiff; the propriety of injunctive and class-wide relief; and the availability of punitive and exemplary damages.

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's July 2025 Delinquency

22.

Plaintiff's first delinquent installment occurred with the July 1, 2025 payment on his Freedom-serviced FHA loan.

23.

Plaintiff promptly attempted to cure the delinquency by scheduling payments through Freedom's online borrower portal and, later, by telephone.

### B. Freedom's Payment Portal Prevented Contractual Cure

24.

Freedom's online portal did not permit Plaintiff to select only the July 2025 installment to bring his loan current step-by-step.

25.

Instead, the portal forced Plaintiff to select a "bundle" consisting of July, August, and September payments, plus inspection fees and late charges. When Plaintiff attempted to deselect fees or later installments, the system automatically re-selected them.

26.

Plaintiff attempted to correct this behavior repeatedly, including refreshing the page, closing and reopening the browser, and confirming he was not inadvertently holding any modifier keys. The system nonetheless prevented a lawful cure of the earliest delinquency

7

sdddddddddddddddddddddddddddddddddddddddddddddddddddddddddds27.

By forcing grouped payments and blocking a targeted cure of the earliest past-due installment, Freedom's system design interfered with Plaintiff's contractual right to reinstate and violated RESPA and Regulation X's servicing-error provisions.

**C. Freedom Locked Plaintiff Out of Online Payments Entirely**

28**.**

Between approximately November 6 and November 20, 2025, Freedom locked Plaintiff out of the online payment portal entirely.

29.

During this period, Plaintiff could not make any online payments, could not access the same functionality other borrowers receive, and could not use the portal to reinstate his loan.

30.

This lockout constitutes a servicing error under 12 C.F.R. § 1024.35(b), including subsection (b)(10), and unlawful dual-tracking under 12 C.F.R. § 1024.41(f), which prohibits moving toward foreclosure while a borrower is attempting to cure.

30.a.

The lockout, and Freedom's treatment of Plaintiff's loss mitigation options (including Freedom's unilateral application for Hurricane Relief, while representing to Plaintiff that it was part of the Federal Covid forbearances, but further, fraudulently applying over 20,000$ obtained from Plaintiff, to old payments which were supposed to have placed at the end of the contractual periods. Plaintiff will prove at trial, other discrete frauds and minipulations and same will be proven at trial.

**D. No Lawful Acceleration Notice Was Ever Issued**

31.

At no point did Freedom issue a written acceleration notice that: (a) declared the loan accelerated; (b) demanded the full unpaid principal balance; and (c) provided a cure deadline and clear consequences consistent with the Note, Deed of Trust, and Louisiana law.

32.

Under Louisiana law and applicable federal servicing rules, lawful acceleration is a strict prerequisite to foreclosure. Without it, Defendants had no present right to invoke executory process or otherwise foreclose.

**E. Freedom's November 12, 2025 Letter Was Informational Only**

33.

On or about November 12, 2025, Plaintiff received a letter from Freedom stating that his loan "remains in default" and that failure to cure "may" result in acceleration and foreclosure.

34.

The letter expressly states that it is for "regulatory compliance and/or informational purposes only" and "does not constitute a demand for payment." It does not declare acceleration, does not demand the full balance, and does not satisfy any Louisiana executory-process prerequisite.

**F. HWM's FDCPA Letter Provided No Foreclosure Notice**

35.

Around the same time, Plaintiff received a letter from HWM styled as an "FDCPA NOTICE."

36.

The HWM letter identifies HWM as a debt collector and provides generic collection disclosures, but it does not state that foreclosure has been initiated, does not provide any Louisiana sheriff sale date, and does not attach or identify any foreclosure pleading.

37.

The combined effect of Freedom's and HWM's communications is to create the appearance of imminent foreclosure while withholding the formal acceleration and foreclosure notices required by law.

## G. Freedom's Borrower App Misrepresented "Active Foreclosure"

38.

Freedom's borrower-facing mobile app and/or portal labeled Plaintiff's account as being in "Active Foreclosure."

39.

At the time this representation was made, no acceleration notice had issued, no foreclosure petition had been filed, Plaintiff had not been served with any foreclosure pleading, and Plaintiff remained contractually and legally entitled to reinstate.

40.

This "Active Foreclosure" designation is a false representation of the legal status of Plaintiff's debt and is misleading and deceptive within the meaning of the FDCPA.

## H. Improper Inspection Fees and Escrow Handling

41.

Plaintiff's loan history reflects multiple "property inspection" fees and related charges that were added to his account in the absence of any lawful trigger or necessity.

42.

These inspection fees were assessed while Plaintiff remained an owner-occupant actively communicating with the servicer and attempting to cure. They were neither reasonably necessary under HUD rules nor properly disclosed.

43.

Freedom also engaged in confusing and inconsistent handling of escrow, including mortgage insurance charges and corporate advances, which further obscured the true amount necessary to reinstate.

**I. Emotional Distress and Other Actual Damages**

44.

As a direct and proximate result of Defendants' conduct, Plaintiff has suffered significant emotional distress, including anxiety, fear of wrongful loss of his home, humiliation at being treated as delinquent despite good-faith efforts to pay, disrupted sleep, difficulty concentrating, mental anguish, and the ongoing burden of navigating conflicting and misleading information from Defendants.

45.

Plaintiff did not seek litigation; he was forced into this position because Defendants' automated systems, fee practices, and deficient communications caused him reasonably to believe that foreclosure was imminent despite his attempts to cure.

46.

These harms constitute "actual damages" recoverable under the FDCPA, RESPA, TILA, and LUTPA.

**J. Credit Reporting and Score Damage**

47.

As a direct result of Defendants' wrongful classification of Plaintiff's loan as delinquent and "Active Foreclosure," Freedom reported negative information concerning Plaintiff's mortgage tradeline to one or more consumer reporting agencies, including Experian.

48.

Following Defendants' servicing and collection conduct, Plaintiff's Experian credit score dropped from the mid-600s range into the mid-500s range within approximately a year, reflecting the impact of derogatory mortgage reporting and associated utilization consequences.

49.

Attached hereto as Exhibit "A" is a true and correct copy of Plaintiff's Experian score history from American Express's "MyCreditGuide," demonstrating the decline in Plaintiff's score during the period in which Freedom mis-serviced and misreported his loan.

50.

The drop in Plaintiff's credit score has impaired his ability to obtain new credit, increased the cost of any credit he might obtain, and damaged his reputation and financial standing in the community.

51.

This credit harm is a foreseeable and direct consequence of Defendants' unlawful servicing and collection practices and forms part of Plaintiff's "actual damages" under the FDCPA, RESPA, TILA/Regulation Z, and LUTPA.

## VI. CLASS ALLEGATIONS

52.

Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class (the "Class"):

*All persons in the United States who, from January 1, 2018 to the present, were borrowers on residential mortgage loans serviced by Freedom Mortgage Corporation who (a) were subjected to improper defaulting practices, including misapplication of payments, creation of artificial delinquencies, or imposition of unauthorized fees; (b) received deficient or misleading default or acceleration communications; or (c) were advanced toward foreclosure in violation of federal servicing standards applicable to FHA-insured or Ginnie Mae–pooled loans.*

53.

Plaintiff also seeks certification of the following subclass (the "FHA/Ginnie Mae Subclass"):

*All borrowers whose FHA-insured loans were pooled into Ginnie Mae mortgage-backed securities and serviced by Freedom, and who were subjected to servicing conduct violating HUD Handbook 4000.1, 24 C.F.R. § 203.500 et seq., the Ginnie Mae MBS Guide, or related federal servicing rules.*

54.

Excluded from the Class and Subclass are Freedom, its officers and directors, its legal representatives and affiliates, and any judicial officers and staff assigned to this case.

55.

A. **Numerosity**

The Class is so numerous that joinder of all members is impracticable. Freedom services

hundreds of thousands of FHA-insured and Ginnie Mae–pooled loans nationwide. On information

and belief, tens of thousands of borrowers have been subjected to the same categories of servicing

misconduct.

56.

B. **Commonality**

Numerous questions of law and fact are common to the Class and predominate over questions

affecting only individual members, including:

a. Whether Freedom engaged in uniform payment-misapplication practices that artificially created or prolonged delinquency;

b. Whether Freedom assessed unauthorized or excessive fees, including inspection fees and "property preservation" charges not permitted by HUD rules;

c. Whether Freedom failed to apply payments to the earliest outstanding installment as required by FHA and Ginnie Mae servicing standards;

d. Whether Freedom issued defective, misleading, or non-compliant default and acceleration notices;

e. Whether Freedom referred loans to foreclosure without lawful acceleration in violation of federal regulations;

f. Whether such practices violate RESPA and Regulation X, including 12 U.S.C. § 2605(k);

g. Whether such practices constitute false, deceptive, or misleading acts under the FDCPA;

h. Whether such practices constitute unfair or deceptive trade practices under LUTPA and analogous state statutes;

i. Whether Freedom's servicing practices constitute unsafe and unsound practices incompatible with FHA and Ginnie Mae program integrity;

j. Whether injunctive relief is necessary to bring Freedom into compliance; and

k. Whether punitive or exemplary damages are warranted.

57.

## C. **Typicality**

Plaintiff's claims are typical of those of the Class because they arise from the same uniform servicing systems and practices that Freedom employs nationwide. Plaintiff and Class members have all suffered harm from misapplied payments, inflated or fabricated escrow deficiencies, unauthorized fees, inability to reinstate due to system design, defective default/acceleration notices, and threats of foreclosure without federal compliance.

58.

## D. **Adequacy**

Plaintiff will fairly and adequately protect the interests of the Class. He has no interests antagonistic to the Class and seeks relief that will benefit all borrowers subjected to the same practices. Plaintiff has retained counsel experienced in complex litigation, consumer-protection law, mortgage-a

59.

## E. Rule 23(b)(2) Injunctive Class

Freedom has acted or refused to act on grounds generally applicable to the Class, so that final injunctive and declaratory relief is appropriate respecting the Class as a whole under Rule 23(b)(2).

60.

Plaintiff seeks injunctive relief requiring Freedom to: correct inaccurate servicing data; cease misapplication of payments and unlawful fee assessments; issue compliant default and acceleration notices; suspend foreclosure activity until compliance is demonstrated; and implement internal controls preventing recurrence.

61.

**F. Rule 23(b)(3) Damages Class**

Common questions of law and fact predominate over any individualized issues, and a class

action is superior to individual suits because:

a. The damages of individual borrowers are relatively modest compared to the cost of litigation;

b. The issues are highly technical and beyond the capacity of most consumers to litigate individually;

c. Freedom's systemic misconduct is best addressed in a single proceeding; and

d. Class treatment prevents inconsistent adjudications and promotes judicial economy.

62.

Class treatment is the only mechanism capable of providing meaningful redress to borrowers

like Mr. Bagala and others who, despite good-faith efforts, were overwhelmed by Freedom's systemic

servicing failures.

## VII. CAUSES OF ACTION

### COUNT I
UNSAFE AND UNSOUND MORTGAGE-SERVICING PRACTICES THREATENING THE
INTEGRITY OF A GINNIE MAE–INSURED LOAN
(Against Freedom and Middleman – Declaratory and Injunctive Relief)

63.

Plaintiff incorporates by reference the preceding paragraphs.

64.

Plaintiff's mortgage loan is FHA-insured and pooled into a Ginnie Mae mortgage-backed

securities program, subject to HUD servicing standards and the Ginnie Mae MBS Guide

65.

As an approved issuer and servicer of Ginnie Mae–pooled loans, Freedom is contractually

obligated to comply with HUD Handbook 4000.1, 24 C.F.R. Part 203, applicable FHA servicing

guidelines, and the Ginnie Mae MBS Guide, including obligations to maintain accurate, auditable records; properly apply payments; follow default-mitigation hierarchies; and avoid unsafe or unsound practices.

66.

These federal servicing standards are incorporated into Plaintiff's Note, Security Instrument, and the federal insurance and pooling agreements governing his loan.

67.

Freedom materially departed from these standards by: misrepresenting Plaintiff's status as in "Active Foreclosure"; blocking access to the payment portal; preventing cure of the earliest delinquency by forcing grouped payments; using inaccurate periodic statements; imposing improper inspection fees; mishandling escrow; and employing collection practices inconsistent with FHA home-retention policy.

68.

These acts jeopardize program compliance, the accuracy of loan records, the enforceability of the mortgage, and the stability of the borrowers' ability to cure and reinstate, thereby threatening the integrity of the Ginnie Mae–pooled asset.

69.

Because Ginnie Mae securities are backed by the full faith and credit of the United States, unsafe servicing practices create federal exposure and undermine national housing policy.

70.

Defendant Middleman, as CEO and controlling owner, has direct responsibility for Freedom's compliance systems and personally signed prior consent orders acknowledging systemic servicing

deficiencies. Yet the same categories of violations continue to occur, demonstrating at least reckless disregard and failure to implement required controls.

B. Freedom's Escrow Administration Was Inaccurate, Unreliable, and Unsafe

71.

The escrow ledger for Plaintiff's loan demonstrates repeated and systemic inaccuracies that violated these federal obligations and materially threatened the integrity of the Ginnie Mae–insured asset.

72.

Freedom withdrew from Plaintiff's escrow account recurring monthly charges of approximately $148.16 for mortgage-insurance premiums ("MIP"), consistent with FHA requirements.

73.

At the same time, each monthly mortgage payment made by Plaintiff included approximately $1,100 in escrow contributions—funds intended for legitimate escrow purposes such as MIP, property insurance, and taxes.

74.

Freedom used only a small fraction of the escrow contributions for actual monthly MIP disbursements and retained the remaining balance of escrow deposits, which—if managed properly—should have reduced Plaintiff's current escrow payment and reduced Plaintiff's total amount due.

75.

Instead of using the escrow surplus to reduce Plaintiff's escrow obligation, Freedom maintained and accumulated unnecessary escrow reserves, creating the appearance of delinquency and artificially inflating Plaintiff's monthly "total payment due."

76.

This practice is directly inconsistent with FHA/HUD escrow rules, which strictly limit the escrow cushion and prohibit retention of borrower funds in excess of the two-month cushion permitted under federal regulation.

C. Freedom's Ledger Reflects Misapplication, Artificial Shortages, and Unlawful Cushioning

77.

The ledger reveals repeated instances where Freedom:

- credited Plaintiff's escrow account with monthly deposits of approximately $1,153 to $1,155;
- disbursed only approximately $148.16 for MIP;
- retained the remaining ~$1,000 in escrow per month despite no lawful basis; and
- treated Plaintiff's account as though escrow deficiencies existed.

These practices manufactured an "escrow shortage" on paper when, in reality, Freedom held thousands of dollars of Plaintiff's escrow contributions that were not being properly used or credited.

78.

The inflated escrow figures directly contributed to inflated monthly payment demands, periodic statement inaccuracies, and false delinquency classifications.

79.

These errors undermined Plaintiff's ability to reinstate the loan, because the payment portal repeatedly forced inclusion of escrow-related "shortages" and "fees" that Freedom itself created through unlawful escrow manipulation.

80.

These failures violate:

1. 12 U.S.C. § 2609;
2. 12 C.F.R. § 1024.17;
3. HUD Handbook 4000.1 (Escrow Requirements);
4. Ginnie Mae MBS Guide §§ 3-13 to 3-17, 18-3, 18-7; and
5. the National Housing Act.

81.

D. The COVID-Era Loss-Mitigation Amounts Were Also Misapplied and Misrepresented

Freedom's treatment of Plaintiff's COVID forbearance and loss-mitigation amounts further demonstrates unsafe escrow accounting.

82.

Freedom applied Plaintiff's reinstatement and post-forbearance payments in inconsistent, non-transparent ways, including posting certain payments entirely to "unapplied funds," reversing payments without explanation, and failing to reconcile escrow before advancing Plaintiff toward default status.

83.

Ginnie Mae requires precise, auditable accounting of COVID-related advances, default advances, escrow advances, and partial claim transactions. Freedom failed to comply.

84.

These errors materially threaten the ability of Ginnie Mae to rely on Freedom's reports for pool-level accuracy, loan-level status, and federal insurance risk.

85.

E. Federal Law Treats Escrow Failures as Unsafe and Unsound Servicing Threats

Ginnie Mae explicitly warns issuers that inaccurate escrow accounting constitutes "unsafe and unsound servicing" because it:

1) destabilizes delinquency tracking;
2) increases risk of wrongful foreclosure;
3) jeopardizes the correctness of monthly MBS reporting;
4) exposes federal insurance funds to unnecessary risk; and
5) forces borrowers into delinquency despite having paid amounts necessary to remain current.

86.

Freedom's mismanagement of Plaintiff's escrow account is not clerical or isolated. It is structural, systemic, and disproportionately harms FHA borrowers. These failures violate federal servicing obligations and materially threaten the integrity of Plaintiff's Ginnie Mae–insured loan.

87.

F. Middleman's Individual Liability

Defendant Stanley C. Middleman is personally liable for these escrow-administration failures because:

• he exercises direct control over Freedom as CEO and sole owner;
• he signed prior consent orders acknowledging systemic escrow administration failures;
• he had actual knowledge of prior escrow-related regulatory violations; and
• he failed to implement controls to prevent recurrence of the same violations.

His failure to supervise and correct Freedom's known escrow deficiencies constitutes reckless disregard for federal servicing policy and the federal insurance program.

88.

G. Entitlement to Equitable Relief

Plaintiff and the Class are entitled to declaratory and injunctive relief because Freedom's

escrow practices:

1)  distort delinquency status;
2)  impair reinstatement rights;
3)  generate unlawful "shortages";
4)  trigger wrongful default or foreclosure; and
5)  threaten the soundness of a federally insured asset.

89.

Plaintiff seeks orders requiring Freedom to:

1)  conduct a full federal-compliant escrow audit;
2)  correct all escrow misapplications;
3)  return or credit any unlawful escrow cushions;
4)  re-calculate Plaintiff's monthly payment under federal law;
5)  halt foreclosure until escrow compliance is restored; and
6)  implement system-wide controls preventing recurrence.

90.

H. Damages

As a direct and proximate result of these escrow violations, Plaintiff suffered actual damages,

including:

- increased monthly payment demands;
- artificial delinquencies;
- wrongful fees;
- obstacles to reinstatement;

91.

Plaintiff is entitled to declaratory and injunctive relief, including orders halting any foreclosure

activity, restoring payment access, compelling accurate accounting and escrow reconciliation, and

requiring Freedom to comply with HUD and Ginnie Mae servicing requirements as to Plaintiff and the Class.

## COUNT II

FAIR DEBT COLLECTION PRACTICES ACT
(15 U.S.C. §§ 1692e, 1692f)
(Against HWM and, to the extent deemed a "debt collector," Freedom)

92.

Plaintiff incorporates by reference the preceding paragraphs.

93.

Plaintiff is a "consumer" and the obligation at issue is a "debt" within the meaning of the FDCPA.

94.

HWM is a "debt collector" within the meaning of the FDCPA because it regularly collects or attempts to collect debts owed or asserted to be owed to others, including Freedom.

95.

To the extent Freedom's collection conduct places it within the statutory definition of "debt collector," Plaintiff asserts this claim against Freedom as well.

96.

Defendants violated 15 U.S.C. § 1692e(2)(A) and § 1692e(10) by falsely representing, directly and indirectly, that Plaintiff's loan was in "Active Foreclosure" when no lawful acceleration had occurred and no foreclosure proceeding had been initiated.

97.

WM's FDCPA letter, when combined with Freedom's "Active Foreclosure" designation and payment lockout, falsely implied that foreclosure was underway and that the entire balance was immediately due, despite the absence of an acceleration notice.

98.

Defendants violated 15 U.S.C. § 1692f and § 1692f(6) by using unfair and unconscionable means to collect a debt and by threatening to take non-judicial action to effect dispossession of the Property without a present right to possession.

99.

As a direct and proximate result of these violations, Plaintiff suffered actual damages, including emotional distress, time lost attempting to resolve the servicing errors, and out-of-pocket costs. Plaintiff is entitled to actual damages, statutory damages, and attorneys' fees and costs under 15 U.S.C. § 1692k.

**COUNT III**
RESPA / REGULATION X
(12 U.S.C. § 2605; 12 C.F.R. §§ 1024.35, 1024.41)
(Against Freedom)

100.

Plaintiff incorporates by reference the preceding paragraphs.

101.

Freedom is a "servicer" of a federally related mortgage loan within the meaning of RESPA and Regulation X.

102.

By locking Plaintiff out of the online payment portal, forcing grouped payments that prevented curing the earliest delinquency, and continuing collection activity while Plaintiff attempted to reinstate, Freedom committed "servicing errors" as defined in 12 C.F.R. § 1024.35(b), including but not limited to subsection (b)(10).

103.

By moving toward foreclosure—through HWM's engagement, internal "Active Foreclosure" status, and collection posture—while Plaintiff remained eligible to cure and no lawful acceleration had occurred, Freedom violated 12 C.F.R. § 1024.41(f)'s anti-dual-tracking provisions.

104.

Freedom also failed to conduct accurate escrow analyses and improperly assessed fees inconsistent with HUD and federal servicing standards, in further violation of 12 U.S.C. § 2605(k) and 12 C.F.R. § 1024.17.

105.

As a result, Plaintiff suffered actual damages, including emotional distress, improper fee assessments, and the costs of seeking legal assistance. Plaintiff is entitled to actual damages, statutory damages, and attorneys' fees and costs under 12 U.S.C. § 2605(f).

**COUNT IV**
TILA / REGULATION Z – PERIODIC STATEMENTS
(15 U.S.C. § 1601 et seq.; 12 C.F.R. § 1026.41)
(Against Freedom)

106.

Plaintiff incorporates by reference the preceding paragraphs.

107.

Freedom is a "creditor" or "servicer" subject to TILA's periodic-statement requirements for closed-end residential mortgage loans.

108.

12 C.F.R. § 1026.41 requires servicers to provide accurate periodic statements setting forth, among other things, the amount due, an explanation of past-due amounts, fees and charges, escrow information, and delinquency information.

109.

Freedom's statements to Plaintiff were inaccurate and misleading because they: (a) included unauthorized inspection fees; (b) failed to state the correct amount required to cure; and (c) did not clearly and accurately disclose the true status of Plaintiff's account.

110.

These violations caused Plaintiff confusion, prevented him from understanding the amount needed to cure, and contributed to the emotional distress and risks described above. Plaintiff is entitled to actual and statutory damages, plus attorneys' fees and costs, under TILA.

**COUNT V**

LOUISIANA UNFAIR TRADE PRACTICES ACT (LUTPA)

(La. R.S. 51:1401 et seq.)

(Against All Defendants)

111.

Plaintiff incorporates by reference the preceding paragraphs.

112.

Defendants are "persons" engaged in "trade or commerce" within the meaning of LUTPA.

113.

Defendants' conduct—including misrepresenting the legal status of Plaintiff's loan as in "Active Foreclosure," imposing unauthorized fees, obstructing Plaintiff's ability to cure, issuing confusing and incomplete notices, and leveraging system design to accelerate delinquency and foreclosure—constitutes unfair and deceptive acts and practices under La. R.S. 51:1405.

114.

Such conduct offends established public policy, is immoral, unethical, oppressive, and unscrupulous, and causes substantial injury to consumers that they cannot reasonably avoid.

115.

As a direct and proximate result, Plaintiff suffered actual damages, including emotional distress, the risk of wrongful loss of his home, and economic harm. Plaintiff is entitled to actual damages, attorneys' fees, and, upon a showing of willful or knowing violations, treble damages under La. R.S. 51:1409.

**COUNT VI**
DECLARATORY JUDGMENT
(28 U.S.C. § 2201)
(Against All Defendants)

116.

Plaintiff incorporates by reference the preceding paragraphs.

117.

An actual, justiciable controversy exists between Plaintiff and Defendants regarding the legal status of Plaintiff's loan, the validity of any claimed acceleration, and Defendants' right to initiate or proceed with foreclosure.

118.

Plaintiff seeks a declaration that: (a) no lawful acceleration has occurred; (b) Defendants currently lack any right to foreclose on the Property; (c) Defendants' servicing practices as alleged herein violate federal and state law; and (d) any foreclosure initiated without first curing the violations described herein is void and unenforceable.

**COUNT VII**
**CLAIM FOR INJUNCTIVE RELIEF**
(Against All Defendants)

119.

Plaintiff incorporates by reference the preceding paragraphs.

120.

Monetary damages alone are inadequate to remedy the imminent threat of wrongful foreclosure, loss of Plaintiff's homestead, destruction of credit, and ongoing emotional distress.

121.

Plaintiff seeks temporary, preliminary, and permanent injunctive relief enjoining Defendants from initiating, continuing, or threatening foreclosure; requiring restoration of Plaintiff's payment access; prohibiting further improper fee assessments or negative credit reporting; and mandating compliance with federal servicing standards as to Plaintiff and the Class.

## COUNT VIII - FRAUD

(Against Freedom Mortgage Corporation and Stanley C. Middleman)

122.

Plaintiff incorporates all preceding allegations.

**2.** Under Louisiana law, fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. Civ. Code art. 1953.

**3.** Freedom Mortgage Corporation and its CEO, Stanley C. Middleman, engaged in a series of intentional misrepresentations, omissions, and manipulations designed to create or exaggerate delinquency on Plaintiff's federally-insured mortgage loan and to advance the loan toward foreclosure for their own financial benefit.

### A. Misrepresentation of Loss-Mitigation Program Identity

**4.** Freedom knowingly represented to Plaintiff that the relief being applied to his loan was part of the federal COVID-19 forbearance and partial-claim program.

**5.** In truth, Freedom unilaterally and without disclosure enrolled Plaintiff in an entirely different "Hurricane Relief" program—one Plaintiff never requested, never consented to, and was never informed about.

**6.** This was an intentional misrepresentation of material fact, made to obtain an unjust advantage: Freedom positioned Plaintiff as a participant in a relief track that would later facilitate adverse accounting actions, premature default status, and foreclosure referral.

### B. Misappropriation and Misapplication of $20,000+ in Loss-Mitigation Funds

**7.** Freedom received more than $20,000 in loss-mitigation/partial-claim funds, which—under federal program rules—were required to be placed in a non-interest-bearing subordinate lien at the end of the mortgage term, not applied to existing installments.

**8.** Freedom instead intentionally applied these funds to old mortgage installments in a manner that artificially increased Plaintiff's delinquency, generated additional fees, and advanced Plaintiff's loan toward default classification.

**9.** This misapplication was not accidental. It conferred a clear and unjust financial advantage upon Freedom by increasing fee revenue, corporate advances, and default-related charges while depriving Plaintiff of the contractual and federal protections associated with a true partial claim.

### C. Suppression of Critical Information

**10.** Freedom intentionally failed to disclose:

- that Plaintiff had been placed into a disaster-relief program he never requested;

- that more than $20,000 had been applied contrary to federal rules;

- that escrow deposits were being miscalculated and overstated;

- that reinstatement was still available;

- that foreclosure had not lawfully commenced;

- that the borrower portal lockout was not due to Plaintiff's actions but to Freedom's internal processes.

**11.** Freedom suppressed this information to create confusion, prevent Plaintiff from curing his delinquency, and maintain the appearance of an enforceable default.

### D. Borrower Portal Manipulation

**12.** Freedom programmed its online payment portal in a manner that prevented Plaintiff from selecting and paying the earliest contractual default (July 2025), forcing him to select multiple payments and unauthorized fees.

**13.** Freedom further locked Plaintiff out of the payment system entirely once he attempted to reinstate—an intentional omission meant to cause loss, increase delinquency, and gain an advantage in collection.

### E. Intent to Gain an Unfair Advantage

**14.** Each act and omission described above was done with the intent to obtain an unjust and unlawful advantage, including:

- creation of artificial delinquency;

- acceleration toward foreclosure;

- accumulation of fees, advances, and recoverables;

- increasing Freedom's financial leverage;

- manipulating loss-mitigation status for servicer benefit.

**15.** Freedom's conduct constitutes fraud under Louisiana law because it was deliberate, systematic, and intended to cause Plaintiff loss while conferring a financial advantage upon the servicer.

### F. Reliance and Damages

**16.** Plaintiff reasonably relied upon Freedom's representations—including its false statements regarding the identity of the relief program, its accounting practices, the application of funds, and the legal status of his loan.

**17.** As a result of this reliance, Plaintiff suffered:

- increased delinquency and exposure to wrongful foreclosure;

- inflated escrow charges;

- improper fees and advances;

- inability to reinstate;

- emotional distress, anxiety, and humiliation;

- reputational harm;

- time, expense, and disruption arising from correcting Freedom's falsehoods.

**G. Entitlement to Damages**

**18.** Freedom and Middleman are liable for all damages resulting from fraud, including:

- pecuniary damages;

- emotional distress damages;

- attorney's fees where permitted;

- punitive or exemplary damages (where available for intentional, malicious conduct);

- equitable and injunctive relief.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully prays that the Court:

1. Certify this case as a class action under Rule 23, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

2. Enter a Temporary Restraining Order and Preliminary Injunction restraining Defendants from initiating, continuing, or threatening foreclosure or related collection activity on Plaintiff's loan, and requiring restoration of payment access and suspension of further fees, pending final judgment;

3. Enter a declaratory judgment that no lawful acceleration of Plaintiff's loan has occurred and that Defendants presently lack the right to foreclose on the Property;

4. Award Plaintiff and the Class actual damages, including emotional distress, out-of-pocket losses, and all other compensable harms;

5. Award statutory damages under the FDCPA, RESPA, and TILA, as applicable;

6. Award treble or exemplary damages where authorized, including under LUTPA for willful and knowing violations;

7. Award reasonable attorneys' fees and costs;

8. Order such class-wide injunctive and equitable relief as may be necessary to bring Defendants into compliance with federal and state law; and

9. Grant such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**WINCH LAW FIRM, LLC**

Justin Lamar Winch, Esq. (LSBA No. 36323)
*Attorney for Plaintiff*
404 Stafford Place
New Orleans, LA 70124
Phone:504-377-2620
justin.winch@winchlawfirm.com

33

**SERVICE INSTRUCTIONS:**

    1)   FREEDOM MORTGAGE CORPORATION
via its registered agent for service of process
C T Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

    2)  Halliday, Watkins & Mann, P.C.

Through their agent for service of process

    3)  Stanley C. Middleman

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

JUSTIN LAMAR WINCH, an attorney at law,
in his individual capacity and on behalf of
similarly situated borrowers,

     **Plaintiff,**

**VERSUS**

                                       **CIVIL ACTION**

                                       **NO. _____**

                                     **SECTION: _____**

FREEDOM MORTGAGE CORPORATION;
HALLIDAY, WATKINS & MANN, P.C.;
STANLEY C. MIDDLEMAN, individually;
JOHN DOES 1–25,

     **Defendants.**

## <u>DECLARATION OF JUSTIN LAMAR WINCH</u>

Pursuant to 28 U.S.C. §1746, I, Justin Lamar Winch, declare under penalty of perjury:

1. I am the Plaintiff in this action.

2. My property is located at 404 Stafford Pl., New Orleans, LA 70124.

3. My July 2025 mortgage payment was the recent payment to become past due.

4. I attempted multiple times to pay the delinquent installment, but Freedom's system would not allow me to select the July payment alone.

5. Between approximately November 6 and November 20, 2025, Freedom locked me out of online payment access entirely.

6. I never received any acceleration notice, foreclosure petition, or sheriff service.

7. Freedom's borrower app falsely displayed my loan as "Active Foreclosure," and, throughout the app, are references to widely divergent charges, costs and fees; it is impossible to know what the true status of my account is.

8. Halliday, Watkins & Mann sent me an FDCPA collection letter, but no foreclosure notice; nowhere on the entire document is the word 'foreclosure' – further, they fraudulently misrepresent amounts owing, and itemization of costs and charges.

9. The conduct of Freedom and HWM has caused me significant distress, including anxiety, humiliation, disrupted sleep, and ongoing fear of wrongful foreclosure.

10. Plaintiff has provided, prior to filing, a copy of this Complaint, via email, read-receipt requested, to Halliday, Watkins & Mann, P.C., and to Freedom Mortgage, thereby satisfying Rule 65(b)(B), requiring this certification of efforts made to give notice to the adverse parties; further, as can be seen from the attached Exhibits, irreparable injury will result if not granted before the adverse party can be heard in opposition.  Each week, Freedom has continued to send property inspectors, add fees, and draw interest from wrongfully-held and inflated escrow funds, all of which causes immediate and irreparable loss in time, money and his credit rating.

11. All facts stated in this Declaration are true to the best of my knowledge.

Executed on this 10th day of December, 2025.

/s/ Justin Lamar Winch

36

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 10, 2025, a true and correct copy of the foregoing was filed with the Clerk of Court using the Court's CM/ECF, which will send a notice of electronic filing to all registered to receive such notifications and that copies were served via email to known counsel of record.

_/s/ Justin Lamar Winch_
Justin Lamar Winch

Attorney for Plaintiff
